# 20 CV 00103

Rey Olsen, appearing pro se

As assignee of Roque De La Fuente

430 East 86th Street

New York, NY 10028

(917) 701-1101

WSGNY@aol.com

JUDGE GARDEPHE

## UNITED STATES DISTRICT COURT

### for the Southern District of New York

---------------------------------------------------------------------------x

Rey Olsen, as assignee of Roque De La Fuente, an individual

*Plaintiff*

      -against-

The Sherry Netherland, Inc., a New York corporation;

Howard M. Lorber, Michael J. Horvitz, Wendy Carduner,

Mary McInnis Boies, Ira A. Lipman,

Dr. Marjorie Fisher Furman, Frederic M. Seegal, Arnold S. Gumowitz,

Edward L. Gardner, individually and as Directors

of the corporate Defendant; and the shareholders/proprietary

lessees and residents of the building owned

by the corporate Defendant; Curtis C. Mechling,

1

Gabriel Sasson:

John Does 1-150

Jane Does 1-150

XYZ, Inc. 1-20

ABC, LLC. 1-20        *Defendants.*

----------------------------------------------------------------

**Jury Trial Requested**

**Complaint for a civil case.**

### I. Introduction

1.        This is a story of a member of a minority racial and ethnic group trying to buy an apartment in a vestigial "white-glove" 1 Fifth Avenue cooperative apartment building owned by Defendant The Sherry Netherland, Inc. (Sherry), with 154 cooperative apartments exclusively owned by whites of western European ethnicities who discriminate against those of different races and national origins. The Sherry holds itself out as the finest full-service residence in Manhattan with twice daily maid service; 24 hour doormen, concierge, plain clothes security staff; and other amenities provided to cooperative unit residents.

2.        The gravamen of this case is intentional, arbitrary and malicious racial and ethnic discrimination against RDLF, a Mexican-American, and a "protected class" under applicable federal law.

3.        Defendant Directors, who are elected by the corporate Defendant's shareholders/proprietary lessees, determine Defendant Sherry's policies of disapproving would-be assignees of its proprietary leases and transferees of its shares of stock, are a "Who's Who" of the

2

professional, business and social elite of New York City whose other directorships include museums, symphony orchestras and Tier I universities.

4. Others, they apparently believe, would take away from the aura of "Our Crowd" that they make their apartments especially valuable, and even the admission of one member of a protected class would "pollute" shared common spaces such as the lobby, hallways, elevators and appurtenant restaurant and night club.

5.        Plaintiff is the assignee of Roque De La Fuente (RDLF), an individual.  Plaintiff was authorized to bring this action under a prior Judgment in the SDNY known as Case No. 17-cv-04759 (PAE).

6.        RDLF is a Mexican-American citizen of the United States and  a member of a minority racial and ethnic group who, in 2017 tried to purchase an apartment in a "white-glove" Fifth Avenue cooperative apartment building owned by Defendant corporation The Sherry Netherland, Inc. (Sherry), of which Defendant Michael J. Horvitz (Horvitz)  is president and a director and with the other Defendants are Directors who collectively comprised the Board of Directors (Board) of the Sherry at all relevant times.

7.        The Sherry holds itself out as the finest full-service residence in Manhattan with twice daily maid service; 24 hour uniformed doormen and elevator operators, concierge, plain clothes security staff; and other amenities provided to cooperative unit residents and the general public who may for one or more nights rent rooms owned by the shareholders of the Sherry.

8.        Revenues from the rentals of cooperative apartments by the general public are shared between the owners and the Sherry which performs all booking and billing functions.

9.        The Sherry's website allows the general public to make reservations to rent apartments in the same way as is usual and customary for hotels.

10.        As rooms owned by shareholders are rented to people from other states and countries,

3

the Sherry is a public accommodation in the same manner as other hotels who are competitors of the Sherry.

11.        The 154 apartments in the Sherry are owned exclusively by whites of western European ethnicities.

12.        During the past 10 years, other than RDLF, no application to purchase an apartment has been considered by the Sherry from any Mexican-American, other Latino-American, African-American or Asian-American.

13.        During the past 10 years every application to purchase an apartment has been approved by the Sherry.

14.        Defendants insure that purchasers of apartments are white only through a unique use of licensed real estate salespersons in the employ of the Sherry, Teresa Nocerino and Susan Hennessey (on-site brokers).

15.        The on-site brokers are compensated by the Sherry through a yearly salary and year-end bonus.

16.        The on-site brokers are supervised by a licensed real estate broker who is in the employ of Stroock, Stroock and Lavan, who otherwise are the attorneys for the Sherry.

17.        All customary and usual commissions that would be earned by real estate salespersons and brokers representing the seller are paid at closing to the Sherry.

18,        Shareholders wishing to sell their apartments are advised by the Sherry to list their apartments through the on-site brokers.

19.        It is implicitly understood by the shareholders that any contract entered into for the sale of their apartments has an enhanced chance of being approved by the Board if:

             (a) the buyer is white and of European ethnicity. apartment in the same manner as

4

they generally treat applications from whites of western European origin.  These countries include Spain, Germany, France,  England, Poland, former Soviet Socialist Republics, Scandinavia, the Baltic and Balkan states.

(b) the buyer was obtained by a Sherry broker salesperson.

20.        The on-site brokers do not have any signage or other presence in the public areas of the Sherry.

21.        Unless a prospective purchaser asks a staff member  if there are real estate brokers present in the building there is no way to know about the existence of the sales brokers.

22.        The sales brokers do not use open listings to make the public aware of apartments that are available for purchase.

23.        Listings are given by the sales brokers only to other select brokers who are made aware of the Sherry's policy that white only may become shareholders.

24.        In the past 10 years, other than RDLF, no member of a protected class, i.e., Latino-American, African-American and Asian-American citizens have ever applied to purchase an apartment in the Sherry.

25.        The gravamen of this case is intentional, arbitrary and malicious racial and ethnic discrimination against RDLF, a Mexican-American, and a "protected class" under applicable federal law.

26.        The shareholders elect Defendant Directors who appoints officers of the corporation, including Horvitz as president.

## II. The parties to this Complaint.

Plaintiff:

Rey Olsen (Olsen) is an individual residing on the commencement date of this proceeding at 430 East 86th Street, New York, NY 10028 Telephone (917) 701-1101. Olsen is the assignee of Roque RDLF, an individual, residing in San Diego, CA.

Defendants:

1. The Sherry, a New York corporation; and its Directors Howard M. Lorber, Michael J. Horvitz, Wendy Carduner, Mary McInnis Boies, Ira A. Lipman, Dr. Marjorie Fisher Furman, Frederic M. Seegal, Arnold S. Gumowitz, Edward L. Gardner, all individuals, are Directors of the Sherry and are named in that capacity and individually. All Defendants reside at 781 Fifth Avenue, New York, New York 10022.  Telephone 212 355-2800.

2. These individual Defendants constitute the entire Board of Directors of the corporate defendant, and wholly dominate, operate and control all its business and financial affairs.

3.   Additional individual Defendants are Curtis C. Mechling (Mechling) and Gabriel Sasson (Sasson), attorneys for the Sherry representing same in the Chapter 7 case of Ninotchka Manus in the SDNY, Case No. 05-10338(SCC).

4.  All Defendants conspired to commit acts of racial and ethnic discrimination against RDLF, who they viewed as undesirable because of his Mexican ethnicity, by not entertaining his application to purchase an apartment in the same manner as they generally treat applications from whites of western European origin.

5.  Defendant Horvitz was at all relevant times the president of the Sherry and was elected to and is accountable to the Board.

6.  The approval of the assignment of a proprietary lease and accompanying shares can only be made by the majority vote of the Board.

7.        Horvitz has no individual authority to approve or reject the assignment of a proprietary lease and accompanying shares.

8.     With regard to RDLF, Horvitz himself made the decision to reject his application and never presented his application to the Board and asked for their vote.

9.     Horvitz acted *ultra vires* as under the bylaws of the Sherry only the Board can accept or reject an application to purchase the apartment of a shareholder.

10.     Other than as to RDLF, the Sherry has never in the past 10 years rejected any applicant to purchase an apartment in the Sherry.

11.     During the time in which Horvitz has been president, upon information and belief, all applicants were approved and all applicants had a familial origin from a European ethnicity.

12.     Horvitz, apparently believes that residents of non-European ethnicities, would take away from the aura of "Our Crowd" that they believe makes their apartments especially valuable, and even the admission of one member of a protected class would be a detriment to the shareholders.

13.     Horvitz and his immediate family have a long personal history of racial discrimination; he worked for his family company in Hollywood, Florida which in their real estate developments imposed a curfew for their Negro workers and banned them from using the beaches that were for whites only.

14.     Defendants asserted in their initial answer to the complaint of RDLF, that they have the lawful right, without being required to state a reason. to exclude anyone from purchasing an apartment in the Sherry.

15.     Plaintiff's claims are grounded in his assertion that the public policy of the United States and the public policies of New York state and New York City, as enunciated in their statutes, regulations and court decisions do not permit Defendants to bar Plaintiff from purchasing an apartment in the Sherry, as they have, solely because he is Mexican-American.

### III. Basis for jurisdiction

7

In addition to the amount in controversy exceeding $75,000, this is a federal question case arising under 28 U.S.C. § 1331 involving the following statutory authorities which prohibit discrimination on the basis of race or ethnicity for the purchasing of residential housing by members of a "protected class" including Mexican-Americans such as RDLF. Also following below are controlling statutes of the State and City of New York that must be applied by this Court under its supplemental jurisdiction if Plaintiff can state a Count under federal law.

Federal statutes.

42 USC § 1982. Refusal to sell property to willing buyer solely on the basis of race or national origin. "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

42 U.S.C. § 2000a *et seq.* Claim injunctive relief for discrimination on the basis of national origin in a hotel, a public accommodation, selling lodging over the internet to transients from throughout the U. S. and the world.

42 USC § 3601. It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

42 U.S.C. § 3613(c)(1). Compensatory and actual damages for violation of rights under § 1982 or the Fair Housing Act. There is no limit for punitive damages.

42 USC 3604(a). To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

Mexican-Americans, such as RDLF, are members of a **protected class** as determined by federal courts.

New York State and New York City statutes and case law precedents prohibit racial and ethnic

8

discrimination in housing and places of public accommodation.

This Court has mandatory supplemental jurisdiction over state law claims when a claim based on federal law is stated in a complaint. 28 U.S.C. § 1367.

New York State statutes

New York Executive Law § 296 5(a)(2). To discriminate against any person because of race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.

New York City Statutes

N. Y. C. Administrative Code § 8-107 4, 5. Public accommodations. a. It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof,

New York Civil Rights Law § 19–a. No corporation formed for the purpose of the cooperative ownership of real estate within the state shall withhold its consent to the sale or proposed sale of certificates of stock or other evidence of ownership of an interest in such corporation because of the race, creed, national origin, or sex of the purchaser.

2. For the purposes of this section a "corporation" shall include the cooperative management, cooperative tenants, cooperative shareholders, or any appointee or successor in interest of a corporation.

The website operated by the Sherry is a place of public accommodation.

9

## IV.  Jury trial

Plaintiff seeks a jury trial under the Seventh Amendment of all claims that are proper for a jury to decide.

## V. Relevant information about RDLF, assignor of Olsen.

1. RDLF was born in San Diego, California to parents whose father was born in Tuxpam, Veracruz, Mexico and mother in Monterrey, Nuevo Leon, Mexico.

2. RDLF was prepared financially to purchase Unit 1211 in the Sherry for $1,275,000 in cash at a sale under § 363(b)(1) of Title 11 of the U. S Code held in the bankruptcy court in the S. D. N. Y.

3. RDLF represented to the bankruptcy court that he had a personal net worth in 8 figures. He stated that he owns businesses in 10 states of the United States, and in 4 other countries. These, he explained, provide him with a regular and sizeable monthly income that is far more than sufficient to pay the monthly maintenance cost of the apartment he sought to purchase.

4. RDLF owns and has owned real estate holdings in New York for over 20 years and are current as to all taxes related to these holdings.

5. RDLF has never been convicted of a felony or misdemeanor and has never been fined by a government agency or court for any of his business dealings or personal conduct. He was censured 30 years ago by an administrative law judge for the lending policies of bank of which he was its president. All loans were repaid in full; no money was lost by anyone; and the bank's shareholders profited from the interest paid.

6. RDLF has never filed for bankruptcy.

7. RDLF forwarded a signed copy of a contract on or about January 4, 2017 between himself and the Trustee in a Chapter 7 case known as Re: Ninotchka Manus, Case No. 05-10338(SCC).

8. Before the Trustee could enter into said contract, its terms and conditions had to be reviewed and

approved by the Sherry and the bankruptcy Court.

9.  These terms and conditions included the proviso that the Sherry could reject the application of RDLF for any reason or no reason.

10. RDLF was an anomalous buyer of the Sherry apartment in that his application was submitted through the Chapter 7 Trustee to purchase the shareholder/proprietary lease for Unit 1211 because the Court determined by Order that he made the highest and best offer at a sale held under 11 U. S. C. § 363(b). There was no real estate broker involvement in the transaction.

11.  RDLF did not learn about the availability of the apartment for purchase through any advertisement or broker but only through the Debtor who had a self-interest, and a statutory right and duty to find buyers to maximize her estate.

12.  When RDLF appeared at a bankruptcy court hearing on December 20, 2016, a bid contract for $1,100,000 had already been entered into the by Chapter 7 Trustee as seller, and buyers provided by the Sherry brokers. The buyers were a white western European husband and wife residing in Monaco. The purpose of the hearing was for the Trustee to convince the Court to Order the bid contract to become a sales contract.

13.  RDLF made a higher offer, all cash and with an immediate closing, which was the highest and best offer. The Trustee furnished RDLF with a bid contract requiring a $100,000 cash deposit to be timely made. RDLF, by his authorized agent, both signed the contract and made the deposit timely on or before December 23, 2016.

14.  The Court scheduled a hearing on January 4, 2017 prior to which the original bidders would be given the opportunity to increase his bid, which they did. Ultimately, RDLF made the highest bid of

15.  $1,275,000 and a sale contract was ordered requiring RDLF to undergo the application procedure that the Sherry's attorney claimed was the Sherry's contractual right to impose. The backup bidder was asked to do the same. It was explained to both of them that to be considered their packages would need to be timely submitted and that each would be required to appear personally

11

for an interview with the Defendant Directors.

16.  RDLF, in compliance, submitted timely and within a few days thereafter, in anticipation of the So-ordering of a sales contract, a complete package including an accountant's financial statements, social reference letters, private club membership details, and several magazines in which his photo appeared on the cover of one. The follow-on pages explained his background as a Mexican-American real estate developer. The focus of the story was his ownership of a 25,000 square foot *rotating* penthouse, the largest of its kind in the world, in Puente del Este, Uruguay, which is a resort destination for residents of Buenos Aires, Argentina.

17.  The Chapter 7 Trustee informed RDLF on or about January 12, 2017 that he was rejected by a vote of the Sherry Board. This was before the Sale Order authorizing the Sherry to consider the application of RDLF was signed and entered.

18.  The Sherry jumped the gun in rejecting RDLF. To use a metaphor, the refusal to approve him as a lessee and transferee was before he was even in the starting gate.

19.  No written explanation was given for the rejection nor did Defendants inform RDLF of any deficiency that he may be able to correct so that he could reapply.

20.  RDLF subsequently learned that as a matter of federal and New York law the Sherry has no right of approval of a buyer in an involuntary sale of its proprietary lease and shares and that its posturing to the contrary was a ruse and misrepresentation of law to keep RDLF out.

21. A federal statute. 11 U. S. C. § 365(f)(1), nullifies all anti-assignment clauses in leases offered in a sale under 11 U. S. C. § 363.

22. New York has a categorical public policy that corporations, notwithstanding any shareholders' agreement to the contrary, have no enforceable right to approve a transferee of its shares in an **involuntary** judicial sale other than the right to match the amount offered, but only if this right appears in the shareholders' agreement itself.

23. The Sherry did not have, regarding Unit 1211, the contractual right or obligation to match an offer made at a bankruptcy sale or a sale by any other means, voluntary or involuntary.

24. Subsequent to the rejection of RDLF who had bid $1,275,000 for Unit 1211, Defendant Directors authorized the Sherry to purchase Unit 1211 on behalf of Defendant Sherry for $990,000 on the condition that their offer not be subject to higher and better offers.

25. Defendants except for Mechling and Sasson therefore are enjoying a direct financial benefit from rejecting RDLF.

26.  By exercising its non-existent right to reject RDLF at a bankruptcy sale, the Sherry earned a windfall of $285,000 that being the difference between what RDLF contracted to pay and what the Sherry contracted to pay.

27. At the subsequent hearing the Sherry's bid of $990,000 was accepted by the Trustee.

28. The Trustee accepted the Sherry bid recognizing the futility of accepting higher and better offers only to have the buyers refused a lease by the Sherry.

29. The rejection resulted in less money being available to pay creditors and a surplus to the Debtor.

30. The effect of his rejection by the Sherry has been devastating to RDLF, who registered with the New York City Campaign Finance Board in April 2017 as a candidate for Mayor of New York City in the 2017 election.

31. The lack of a residence in New York City prevented RDLF from registering with the New York City Board of Election and the New York City Campaign Board in January 2017 and beginning his campaign immediately thereby causing him to miss out on 2 public debates.

32.        The degradation of being rejected on racial and ethnic grounds has manifested itself in physical ailments such as sleeplessness and headaches and consequential depression because of the intentional infliction of emotional distress upon RDLF by Defendants the Sherry and its

Directors solely because of RDLF's race and ethnicity as a Mexican-American.

### VI. Relevant Information about the Sherry and related Defendants.

1.  The Sherry operates on its premises at 781 Fifth Avenue in Manhattan a deluxe hotel that accepts reservations from a worldwide clientele.

2.  The Sherry solicits room reservations from residents of other states and countries exactly in the manner employed by commercial hotels in New York City.

3.  Third parties operate an appurtenant restaurant,  shops; and a nightclub all patronized by customers from all over the U. S. and the world.

4.  The restaurant provides room service, breakfast, lunch and dinner, to the 154 cooperative apartments and restaurant service to the public.

5.  In the course of sourcing services and products, the Sherry engages in interstate commerce by making purchases from residents of states other than New York.

6.  The Sherry operates a website on which it solicits the general public to make reservations to stay in apartments owned by the shareholders.  www.sherrynetherland.com

7.  All businesses operated in the Sherry therefore are public accommodations as defined by controlling federal and New York State and City law.

8.  Revenues from said third parties flow into the Sherry's income statement and tax returns in the same manner as maintenance paid by the proprietary lessees of co-op apartments including Unit 1211.

9.  The market value of apartments in the Sherry varies from $500,000 for servant's quarters to over $65 million for full floor layouts.

10.  The shareholders elect Defendant Directors who appoints officers of the corporation including

14

Defendant Michael Horvitz (Horvitz) as president.

11.   The shareholders who are pleased with the status quo benefit from the Sherry's uniquely present in-house licensed real estate salespersons (the Sherry brokers) who list their apartments for sale and rentals and screen applicants to allow only whites of western European ethnicities to buy or rent apartments.

12. The Sherry controls its in-house brokers who are salaried and whose licensed real estate broker is an employee of the Sherry's attorneys, Stroock, Stroock & Lavan (Stroock), which employs Defendants Mechling and Sasson.

13. The shareholders have conspired with each other to elect Directors who choose officers committed to keeping Mexican-Americans and other protected classes from purchasing apartments in the Sherry. For the past 10 years not a single Mexican-American, African-American or Asian-American has become a shareholder/proprietary lessee of the Sherry.   All 154 shareholders/proprietary lessees are of white European ethnicities.

14.        Only those who are pre-cleared by the Sherry brokers are allowed to complete the application process that includes the completion of forms provided by the Sherry brokers, the submission of financial statements, social references and a personal interview with the Defendant Directors.

15.        .   Upon information and belief, members of protected classes who are screened by the Sherry brokers have been discouraged by them from undergoing the application process by being told falsely there are no apartments currently available or under contract.

16.        No member of a protected class has been approved by the Sherry Board to purchase an apartment in the past 10 years.

17.        Upon information and belief the Sherry is an anomaly in that other cooperative apartment buildings of similar and larger size do not have in-house brokers on their payroll as does

the Sherry

18.  Thus while pre-qualification by the Sherry brokers is an outwardly neutral process, in practice it results in the submission of the vast majority of applications from members of the white race of western European ethnic backgrounds.

19.      In the last 10 years all applicants were of European ethnicities and all of their applications were approved.

20.      Defendant Director Howard M. Lorber (Lorber) is the Chief Executive Officer of Douglas Eliman, Inc. a real estate brokerage company with upon information and belief 4,000 licensed broker salespeople and $25 billion in annual revenues.

21.      Lorber is an expert on the residential marketplace for co-ops in Manhattan and is aware that there is a clientele who embrace racial and ethnic discrimination in housing and who will pay a premium to reside in a building in which the apartments are owed exclusively by whites of western European ethnicities.

22.      Lorber holds himself out as a long term and very close personal friend  of Donald J. Trump, the President of the United States.

23.      The President has appointed Lorber Chairman of the National Holocaust Museum. Lorber's grandparents were Jewish emigrants from Greece.

24.      Following then candidate Trump's entry in June 2015 into the 2016 Presidential race, Lorber, according to a report in the Washington Post on August 10, 2016, organized receptions for Trump in the Hamptons and elsewhere and personally donated $100,000 to Trump's campaign fund. Previously Lorber had appeared on Trump's television show, "The Apprentice."

25.      Lorber has vouchsafed for Trump in Moscow to members of the Russian government at the highest level, according to the pre-mentioned report in the Washington Post.

26.  When Trump announced his candidacy in June 2015, he said this about Mexicans who come to America:

> "When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists"

27.      Trump also added emphasis to the need, shared by the Sherry, to keep Mexicans out:

> "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall."

28.      Lorber at no time disavowed the preceding sentiments of Trump in any public statement and therefore may be deemed to agree with them.

29.      Upon information and belief Lorber has held fundraising activities for Trump in his apartment at the Sherry.

30.      Presumably given Trump's virulent anti-Mexican remarks, it would be highly embarrassing and anathematic for Lorber and Trump to meet Mexican friends and relatives of RDLF in the lobby and elevators of the Sherry.

31.      Defendants in their response to RDLF's First Amended complaint, dissembled by asserting that they had no knowledge that RDLF was a Mexican-American before rejecting him.

32.      This assertion was false and willfully and knowingly made to mislead this Court.

33.      Defendant Directors were well aware that RDLF was Mexican-American **before** rejecting his application. Attorneys for the Sherry, Sasson and Mechling,  were in the bankruptcy court courtroom 621 on December 20, 2016 in the presence of RDLF and his son, Riccardo.  Both

spoke Spanish in their presence.  Additionally RDLF circulated magazines in the Spanish language to Sasson and Mechling featuring RDLF on the covers and feature stories about RDLF therein.

34. In its Memo of Law in support of its motion to dismiss the first amended complaint, reference is made to a published case in which RDLF was a party. Dkt. 22, Def.  Memo of Law, p. 5 (P 13 of ECF). In the same case appears a statement that the mother of RDLF was a housewife residing in Mexico City. de la Fuente v. F.D.I.C., 332 F.3d 1208, 1215 (9th Cir. 2003)

35. On January 4, 2017, Sasson was also present as the transcript shows. The transcript also shows that RDLF had difficulty in pronouncing a certain word and was chastised by the Court for this shortcoming and asked to make repeated efforts to get it right. RDLF, who appeared *pro se*, apologized and asked if he could make a re-statement using a substitute word that was easier for him to pronounce.  It was plain that English was RDLF's second language.

36. If an attorney had represented RDLF, in view of the Court's criticism of his difficulties in speaking English, an interpreter would have been requested. Again, Sasson's knowledge is imputed to the Defendant Directors.

37. The name "De La Fuente" has a unique meaning, appearing only in the Spanish language, namely "of the fountain,". It refers to families who lived in proximity to the ancient water supply for a community, a fountain.

Furthermore, the English word fountain has very different translations in other European languages:

German: *Brunnen*

French: *Fontaine*

Italian: *Fontana*

Because Spanish surnames are so readily differentiated, the Chief Judge of the E.D.N.Y., in a case treating with peremptory challenges of venire members based on their last names, relied upon a U.

S. Supreme Court holding that Mexican Americans are cognizable solely on the basis of their last names:

> See, e.g., Castaneda, 430 U.S. at 495, 97 S.Ct. at 1280 (Mexican–Americans are cognizable because "Spanish surnames are just as easily identifiable as race");

> United States v. Biaggi, 673 F. Supp. 96, 101 (E.D.N.Y. 1987), aff'd, 853 F.2d 89 (2d Cir. 1988) [Chief Judge Weinstein]

## VII. Relevant procedural background

1.  On December 20, 2016 RDLF was present in-person during a hearing held in the Bankruptcy Court of the Southern District of New York in an involuntary Chapter 7 case known under Case Number 05-10338(SCC).

2.  The hearing was short-noticed by the Chapter 7 Trustee in the said case.

3.  The purpose of the hearing was for the Court to determine whether a motion filed by the Trustee under FRBP 6004 and 11 USC § 363(b)(1) to evaluate if an offer from a third party, the initial bidder, Mr. Allessandro Falzoni (Falzoni) residing in Monaco, of a $1,100,000 cash payment to purchase Apartment 1211 in a cooperative commercial building located at 781 Fifth Avenue, New York, New York 10021, that was owned by the estate of the Debtor, was a fair and reasonable offer pursuant to 11 USC § 363(b)(1).

4.  Notices of the motion were given by the Trustee to all parties-in-interest including the Sherry and the Debtor.

5.  The Debtor invited  RDLF to bid for the apartment owned by her estate hoping to maximize its size.

6.  As the Sherry in their Memo of Law supporting its motion to dismiss reveals that it did case law research while considering RDLF's application, it is reasonable to believe that they also did internet

research. RDLF was a candidate for the U. S. Presidency in November 2016. The Court is requested to take judicial notice of the Wikipedia reference disclosing that RDLF is a Mexican-American:

> "De La Fuente was born on October 10, 1954[2] at Mercy Hospital in San Diego, California, the son of Roque Antonio De La Fuente Alexander and Bertha Guerra Yzaguirre. **His parents raised him in Mexico (Mexico City, Tijuana, Baja California), and in the United States (San Diego, and Anaheim, California). He was educated by his parents and the Legionaries of Christ, the Marist Brothers, the Carmelite Sisters of the Most Sacred Heart, Daughters of the Holy Spirit and the Jesuits.** As a youth, De La Fuente attended Saint Catherine's Military Academy in Anaheim, California and then earned a B.S. in Physics and Mathematics from the Instituto Patria National Autonomous University of Mexico, and studied Accounting & Business Administration at Anahuac University near Mexico City." [Emphasis added.]
>
> https://en.wikipedia.org/wiki/Rocky_De_La_Fuente

7.  RDLF upon information and belief is the only Mexican and/or Latino-American citizen ever to submit an application to purchase an apartment in the Sherry.  Notably because the bankruptcy court had appointed an independent broker, Nocerino and Hennessey had no involvement in screening applicants in contradistinction to all other applicants for the past 10 years.

8.  RDLF entered into a sales contract with the Trustee of a Chapter 7 case and not through the Sherry brokers that is the usual method for the presentation of offers, securing their acceptance and the preparation of sales contracts..

9.  The bankruptcy court issued a Sale Order on January 13, 2017 naming RDLF the most qualified bidder, after which the Sherry was to consider the application of RDLF. A copy of the Order was furnished to the Sherry's attorneys.

10. Previously however, Horvitz and decided to reject RDLF without involvement by the Board which never voted to reject RDLF according to deposition testimony of Defendant Lipman and Michael Ullman (Ullman), the Chief Operating Officer of the Sherry who was present for the Board meeting held on January 10, 2017.

11.  Because of Horvitz rejection, the Trustee's attorney Scott Markowitz advised RDLF that he

need not appear for the personal interview.

12.  The Sherry, a New York corporation, can only act through the vote of its Directors.

13.  That his ethnicity was the reason for his rejection was conveyed to RDLF by Ullman, the chief operating officer  of the Sherry, who met with RDLF at cocktail time in the bar in Cipriani's restaurant in the Sherry building in early January 2017 as observed by Olsen.

14.  Ullman previously had been the general manager of the Valencia resort hotel in La Jolla, California, a few miles north of San Diego, where RDLF has lived and worked for most of his adult life.

15.  Ullman told RDLF he was well aware that RDLF was the largest landowner in San Diego and had operated 9 or more car dealerships simultaneously in San Diego County.

16.  Because the dealerships installed license plate holders with the De La Fuente name on thousands of automobiles, there is general familiarity with the De La Fuente name among motorists throughout San Diego County.

17.  Ullman made it clear to  RDLF on behalf of  Defendants that "your kind" was not  welcome to become the owner of a cooperative apartment at the Sherry but that as a member of the public he was free to stay in a cooperative apartment unit as a hotel guest and to patronize the businesses operated in the Sherry by third parties.

18.  RDLF understood your kind to mean Mexican-Americans who could never be "insiders" at the Sherry, but only "outsiders looking in" and that RDLF was the victim of this intentional and long-standing discrimination policy of the Defendant Directors.

19. RDLF and Ullman spoke within eyesight of Olsen who was seated during the entire conversation at a table in Cipriani's restaurant in the Sherry.

20. Immediately after returning to the table RDLF informed Olsen as to his conversation with

21

Ullman and Olsen made notes.

21. Sasson, on behalf of the Sherry asserted to the bankruptcy judge that under its proprietary lease with the Debtor, the shares and lease could only be sold under 11 USC s (b) or (c) if the Sherry's Board approved the buyer which could withhold consent for any or no reason.

22. Sasson asserted to the bankruptcy judge that none of the exceptions in 363(f) applied.

> **(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> **(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> **(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> **(4)** such interest is in bona fide dispute; or
>
> **(5)** such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

§ 363. Use, sale, or lease of property, 11 USCA § 363 (f)(1).

23. The amount of the Sherry's post-petition lien was less than $100,000 and the amount bid by RDLF was $1,275,000 cash thereby permitting a sale under § 363(f)(3).

24.  After being rejected, in January 2017, while staying at the Sherry, RDLF spoke with Nocerino who had her office in the building, to see if he could "save" the situation by assigning to his adult daughter, a Mexican-American citizen, his contract to become the shareholder and lessee of Unit 1211.

25.  Nocerino informed him that if she would post a "deposit" of approximately $500,000 to the general fund of the Sherry, the amount of 5 years' monthly maintenance and expected assessments on Unit 1211, that the Board may consider her favorably.

22

26. Notably this would not relieve her from making timely monthly payments of maintenance and assessments.

27. It was explained by Nocerino that the deposit would be a long-term interest free loan to the Sherry. The daughter refused.

28. RDLF subsequently learned that this requirement was not made of white ethnically west European purchasers and that the only Asian (non American citizen) owner of an apartment, Miles Kwok (Kwok), paid $3 million in a similar deposit arrangement in 2016 and was approved by the Board to purchase Unit 18 for $63 million.

29. Kwok subsequently learned that this was an arrangement, *sui generis*, as to him but not to whites of western European origin.

30. Kwok since has sued the Sherry for racial and ethnic discrimination.

31. After RDLF agreed to bid the Debtor filed a timely objection to the proposed sale that had been short-noticed and informed the Court that a third party would attend the hearing and bid.

32. RDLF attended the hearing and participated *pro se.*

33. RDLF made a *bona fide* initial offer of a $1,195,000 cash payment to purchase.

34. RDLF and the Trustee signed a sales contract that was first reviewed by the Sherry which insisted that RDLF escrow a $100,000 deposit that would be forfeited to the Trustee if RDLF did not close for any reason.

35. RDLF was required to and did timely wire a $100,000 deposit to the Trustee under a term of said contract.

36. A few days later, after the initial bidder, Falzoni, increased his bid, RDLF increased his bid to $1,275,000 all cash which was recommended by the Trustee and accepted by the Court as the highest and best bid.

23

37. The Sherry, by its attorneys attending the hearing on December 20th, informed the Court that no sale could be concluded by the estate to RDLF without its approval of RDLF who the Sherry demanded timely submit financial and other information about himself, known as a "Board Package" to the Trustee for forwarding to the Sherry.

38.  RDLF also had to agree to make himself available for a personal interview with the Board of Directors of the Sherry.

39. It is undisputed that RDLF timely submitted a complete Board Package and was available for the said interview.

40, Horvitz, after receiving the Board Package, and without any personal interview, on or before the morning of January 13, 2017, which was before the entry of a Sale Order in the afternoon of January 13th, informed the Trustee that RDLF was unacceptable to  the  Board of the Sherry that had voted to reject RDLF.

41.  No reason was given to the Trustee by Horvitz for the rejection of RDLF.

42.  Horvitz maintained that the Sherry could reject an applicant for any reason or no reason.

43.  During deposition testimony Horvitz claimed that he relied upon a "litigation report" furnished to him by Stroock on or about January 9, 2017 which the Sherry produced for the first time at the deposition.

44.  Said litigation report was undated.  Plaintiff asserts that it was received well after the January 10, 2017 to create a pretext to reject RDLF.

45.  In fact the Board never saw the Board package  or the litigation report and never voted upon the application of RDLF.

46.  The initial bidder refused to submit a complete Board Package, withdrew and was refunded his deposit.

47. In law, any contractual right of the Sherry to approve the buyer of one its unit owner's lease at an involuntary judicial sale is voided by bankruptcy statute, 11 U.S.C. § 365(f)(1).

48.  A corporation's right to object to the judicial sale of its shares is contrary to the public policy of New York as this would limit the remedies of a judgment creditor by allowing a corporation to judgment-proof its shareholders by rejecting all who would buy his shares.

49. Immediately after the rejection of RDLF, the Trustee put the apartment back on the market with an asking price of $1,100,000.

50. The $100,000 deposit of RDLF was not refunded.

51. Most of RDLF's deposit was paid to the Sherry by the Trustee to cover monthly maintenance until the apartment was sold.

52.  Unit 1211 was ultimately purchased by the Sherry itself for slightly less than $1 million.

## VIII Counts

*All causes of action are against the Sherry and its Directors in their official and individual capacities except for the last Count which is also against the individual shareholders/proprietary lessees and residents of the Sherry who conspired to elect Directors with a known bias and prejudice against Mexican Americans and other protected classes. The cause of action stating against Mechling and Sasson also include all other Defendants who conspired with them.*

### <u>First Count</u>

**First Count Housing discrimination under the Fair Housing Act, 42 U.S.C. §3601 et seq.**

 1. Plaintiff repeats and re-alleges all of the relevant factual allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

 2. After RDLF entered into a contract to purchase Unit 1211 in the Sherry, and tendered a $100,000

25

cash deposit, Defendants denied a closing of the sale to RDLF solely because of his race and ethnicity in explicit violation of 42 USC 3604(a).  Defendant Directors individually participated in an intentional tort to deny RDLF the benefits of his contract with the Trustee that was subsequently approved by Order of the bankruptcy court. Defendants' acts in rejecting RDLF were intentional, arbitrary and malicious.

3. RDLF seeks a declaratory judgment that with respect to an involuntary Chapter 7 sale in New York (or any involuntary judicial sale), no New York cooperative corporation has the right to object to the transferee of its shares as a matter of public policy; and, that under 11 U.S.C. § 365(f)(1) no lessor can object to the assignment of its lease with the Debtor as a sale conducted under 11 U.S.C. § 363(b)(1).

4. RDLF seeks compensatory damages for Defendants' tortious interference with his contract with the Trustee to purchase Unit 1211 an for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

## Second Count

### Housing discrimination under 42 U.S.C. § 1982 by reason of racial animus

5. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

6. Defendants intentionally discriminate against Mexican-Americans and other minorities.  This policy has kept over 95% of the Sherry apartments owned exclusively by whites of western European ethnicities.

7. The Sherry's in-house broker, headed by Nocerino, screens would be applicants and intentionally steers away Mexican-Americans and other protected classes such as blacks.

8. RDLF, because he found out about the availability of the apartment from the Debtor, and entered into a sales contract through the bankruptcy court, Nocerino did not meet him until after he had

signed the bid contract.

9. After being refused a lease by the Defendants Directors, RDLF met with Nocerino to ask him his adult daughter could purchase Unit 1211.

10. Nocerino stated that if the adult daughter of RDLF made a "security deposit" of 5 years maintenance and assessments, approximately $500,000 in cash, and agreed to pay the monthly invoices timely, the Board may consider her application favorably.

10. Based on information and belief this request has never been made of white purchasers of western European ethnicities.

11. Another member of a protected class, Kwok, in 2016, became the only Asian shareholder only after he made a deposit of approximately $4 million. After learning that whites were not required to make such a deposit, Kwok sued for racial and ethnic discrimination. The Court is requested to take judicial notice of the facts alleged in Kwok's complaint filed in this Court under Index No. 16-CIV-06246.

12. Finally RDLF was declined a personal interview with the Board, an action in the application process that is customarily granted to all white applicants of European ethnicities so that they may display their bona fides to best advantage. This declination is an action that indicates a clear intent to discriminate against RDLF.

13. Defendants' acts in refusing a lease to RDLF were intentional, arbitrary and malicious.

14. Based on false statements in the Sherry's Memo of Law in support of its motion to dismiss the First Amended Complaint, in which it is stated that Defendants had no idea that RDLF was a Mexican-American, it is transparent that the refusal to interview RDLF was a "head in the sand" tactic to establish a defense of being unaware of the race and ethnicity of RDLF.

15. Said defense is puerile as the knowledge of an agent such as Sasson, who negotiated with RDLF before any application was made, is imputed to his principal, Defendants Sherry and its Directors.

27

16. Because there are no Mexican-Americans who are shareholders in the Sherry, it is not possible to present statistical comparators to the general population of Mexican Americans using the standards methods of chi square and standard deviations from the mean.

17. Courts have remarked, however, in similar circumstances, that an "inexorable zero" is a very important number when evaluating the presence of racial and ethnic discrimination.

18. Defendant Directors individually participated in an intentional tort by depriving RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

19. RDLF seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages. 42 U.S.C. § 3613(c)(1).

## Third Count

**Denial of the rights of enjoyment of a public accommodation under 42 U.S.C. § 2000a et seq.**

20. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

21. The Sherry, unlike virtually every other co-op in Manhattan, is a for-profit corporation. Its shareholders/proprietary lessees make their furnished apartments available to the management of the Sherry to rent out as hotel rooms to transients. Revenues are shared as between the unit owners and Defendant Sherry. Hotel customers come from all over the U. S. and indeed the world using various internet websites to make reservations.

22. The Sherry owns the building at 781 Fifth Avenue in Manhattan. Within the building are retail shops with sidewalk frontage; a restaurant, Cipriani's, which provides room service to residents and is open to the public; and a club, Doubles, which has a "velvet rope" policy in which its manager, Defendant Wendy Carduner, makes arbitrary and capricious decisions as to who she deigns to admit.

28

23. It is U. S. Supreme Court precedent that if a business holds itself out as a public accommodation only in part, the entire business is a public accommodation. Daniel, 395 U.S. at 305, 89 S.Ct. at 1701.

24. It is not lawfully possible for the Sherry to avoid being considered a public accommodation by segregating its businesses within the same building so that some are open to the general public and others are not.  It is an all or nothing proposition, once the camel's nose is inside the tent, it is a public accommodation.  This is especially so as the Sherry exists to earn a profit in all of its activities.

25. Based on his personal observations made during multiple stays at the Sherry in late 2016 and early 2017, RDLF noted that during his use of the manned elevators, the floor corridors, and the lobby, at all hours of the day and night, that he saw no Mexican-Americans, blacks or Asians using these same facilities.  All users that he observed were of the white race.

26. RDLF, although he was permitted to stay as a hotel guest and to purchase meals at Cipriani's, was not permitted to purchase Unit 1211 or enter Doubles to play backgammon, one of his favorite pastimes.

27. A diligent search has revealed no current case law that permits a unitary business to deny access on racial or ethnic grounds to a portion of its facility while accepting purchases made in other portions by these same groups. "Jim Crow" laws have been outlawed by the Civil Rights Act of 1964.

28. Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

29. Plaintiff seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

### Fourth Count

**Disparate treatment under the Fair Housing Act,  42 U.S.C. §3601 et seq.**

29

30,   Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

31. After the Sherry rejected RDLF's purchase application that he had tendered with a $100,000 deposit, the Sherry instructed the Chapter 7 Trustee to use said deposit to pay the Debtor's maintenance to the Sherry and not to refund the deposit to RDLF.

32. Plaintiff has been unable, after a diligent national search of case law, to find a single instance whereby the seller of a housing unit was able to retain the deposit of a buyer who had complied timely with all contractual requirements, and who was ready, willing and able to timely close, to keep the buyer's deposit because the seller arbitrarily and capriciously decided not to close.  This is a per se discriminatory act against a Mexican-American who appeared pro se in the bankruptcy court on December 20, 2016 and January 4, 2017.

33. Plaintiff alleges that Sherry treated RDLF solely because he is a Mexican American with the temerity (who does he think he is?) to want to live in the Sherry, and to serve as an example to other Mexican-Americans and other protected classes that trying to purchase an apartment in the Sherry is futile and could result in a considerable loss of their personal capital.

34. Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

35. Defendants' acts in refusing a lease to RDLF were intentional, arbitrary and capricious.

36. Plaintiff seeks a declaratory judgment that the Sherry must return the $100,000 deposit.

### Fifth Count

### Disparate impact under the Fair Housing Act,  42 U.S.C. §3601 et seq.

36.Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

30

37. The policy of the Sherry for using its in-house brokers to solicit purchasers for apartments whose owners wish to sell them, while a facially neutral practice, has a significantly adverse and disproportionate impact on all MexicanAmericans, not only RDLF.

38. The in-house brokers only make prospective purchasers of white European ethnicities aware of the apartments that are on offer.

39.  Plaintiff challenges this practice that results in sales of apartments only to whites.

40. During the past 10 years all applicants to purchase apartments have been white and all applicatins have been approved.

41.  No applications have been received and put to the Board for approval from Mexican-Americans, African-Americans or Asian-Americans.

42. The resale of apartments at the Sherry could be accomplished by the use of open listings with all licensed real estate brokers.

43.  The Sherry is the only cooperative apartment building in Manhattan that employs multiple in-house broker salespersons.

44. Disparate impact can usually be proven statistically through standard deviation analysis and the chi square test.  When, however, the Mexican-American population of Sherry shareholders is zero, and there are 319,000 Mexican Americans residing in New York City[1] a statistical analysis showing under-representation of Mexican-Americans in the Sherry therefore becomes unnecessary.  Zero out of 319,000 is a sufficient statistical statement to show racial and ethnic discrimination.

_____

[1]     2     http://www.gothamgazette.com/index.php/government/5334-as-mexican-community-growslocal-leaders-eye-greater-political-prowess

45. The Court is also requested to take judicial notice that the majority of residents in New York City are Latino-American, African-American and Asian-American and that only a minority are white.

46. Plaintiff also seeks a declaratory judgment that the requirement of the Sherry that all applicants to purchase apartments, other than by involuntary sale, go through the Sherry brokers leads to disparate treatment of and impact upon minority members of protected classes.

47. Plaintiff asks that this practice be enjoined and that interested sellers be limited to using third party licensed real estate brokers of their choice.

48. Plaintiff also seeks compensatory damages to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

### Sixth Count

### Violation of New York Executive Law § 296 5(a)(2).

49. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

50. Defendants would not allow RDLF to close on his intended purchase of Unit 1211 in the Sherry.

51. Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

52. Defendants acts in refusing a lease to RDLF were intentional, arbitrary and capricious.

53. Plaintiff seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

### Seventh Count

### Violation of N. Y. C. Administrative Code § 8-107 4, 5. Public accommodations.

32

54. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

55. RDLF was discriminated against by Defendants who refused to close on his purchase of Unit 1211.  N.Y.C.  § 8–107[5] ).

56. Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his So-Ordered sales contract with the Chapter 7 Trustee to purchase Unit 1211.

57. Defendants' acts in refusing a lease to were intentional, arbitrary and capricious.

### Eighth Count

**Fraudulent inducement by Defendants Mechling and Sasson
in conspiracy with all other Defendants**

58. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

59.    Mechling/Sasson, acting in a conspiracy with each other and all other Defendants, misrepresented to RDLF, who was unrepresented by counsel, that he would need to complete and submit a "board package" to be approved by a vote of the Board of the Sherry before RDLF could close on his purchase of Unit 1211 in a § 363 sale.

60.  They further misrepresented that RDLF would need to make a $100,000 deposit as a precondition of submitting a package to the Board of the Sherry for its consideration and vote on January 10, 2017.

61. These were material misrepresentations of a then presently existing fact. No other applicant who was a citizen of the United States, as is RDLF, was required to make a $100,000 deposit as a condition to purchase an apartment.

62. Falzoni, who was required to make a $100,000 deposit, is a non-U. S. citizen.

33

63.  Defendants did not explain to the bankruptcy court that Falzoni was required under the rules of the Sherry to make a $100,000 deposit because he was not a U. S. Citizen and had no assets in the U. S.

64.  Defendants misled the bankruptcy court into believing that all applicants had to put up $100,000 which was a misrepresentation of a current fact.

65. It can reasonably be inferred that their intent was: (1) to deceive RDLF to cause him the loss of his $100,000 deposit that was subsequently used to pay to the Sherry the maintenance of Unit 1211 and (2) to create an extra-legal condition to prevent RDLF, a Mexican-American from purchasing Unit 1211 as the high bidder at a § 363 sale.

66. RDLF reasonably relied upon their representation as they were partners in a well known law firm, Stroock, Stroock & Lavan and as they were appointed by the Sherry as its agents.

67.  RDLF was damaged as although the Board never considered the package that RDLF timely submitted, Melching/Sasson misinformed the Trustee that the Board had voted to reject RDLF.  This was untrue as no vote was ever held.

68. RDLF's damages are as follows:

(a) Loss of his $100,000 deposit.

(b) Loss of the benefit of the bargain.  The Sherry itself purchased Unit 1211 for $970,000 for which RDLF had bid $1,275,000 and which had a market value of at least $1,800,000.

69  The recitation of the following circumstances are intended to comply with FRCP 9(b):

<u>Who:</u>  Melching/Sasson

<u>What:</u> Misrepresentations that RDLF could not purchase Unit 1211 without submitting a board package and that the Board would vote in January 2017 to consider said package if it was timely submitted and if RDLF provided a $100,000 deposit to the Trustee.

34

<u>When:</u>        In January 2017

<u>Where:</u>        In courtroom 621 and its environs of the Hon. Shelley C.      Chapman, Bankruptcy
Judge in the SDNY at Bowling Green, New York, N. Y. 10004

<u>How:</u>            By their verbal communication with RDLF in the environs of the courtroom and
by documents they provided contemporaneously to RDLF for his completion and submission to the
Board.

70.  There is no federal law requiring bidders at a § 363 sale to post a non-refundable deposit if their
bid is not accepted.

71.  RDLF was required to meet this requirement imposed by the Sherry as an impediment to the
purchase of an apartment in the Sherry by RDLF, a member of a protected class as a Mexican-
American.

### Ninth Count

**Violation of the covenant of good faith and fair dealing in contractual relations by all
Defendants.**

72. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth
in §§ I. to VII. supra as if fully set forth herein.

73.  Melching/Sasson, acting on behalf of the other Defendants, advised RDLF that in order to have
the "opportunity" for the Board to consider his application to purchase Unit 1211, he needed to
submit a Board Package and make a $100,000 deposit that would be forfeited if he did not close for
any reason.

74.  RDLF interpreted this to mean that if he did not pay the remaining $1,175,000 on the closing
date that he would forfeit the $100,000.

75.  It is undisputed that RDLF complied totally with the above requirements.

76.  The Board, however, never considered the application of RDLF and never voted to accept or

reject him.

77. Nonetheless, Melching/Sasson informed the Trustee that RDLF was rejected by a vote of the Board and that his deposit should be deemed forfeited because he did not close due to the vote of the Board not to allow him to close.

78. Melching/Sasson misrepresented that the Board had reviewed the package submitted by RDLF and had voted to reject him.

79. In fact, as revealed in deposition testimony of those who were present, the Board never voted on the application of RDLF and other than Horvitz, never saw RDLF's application package.

80. Horvitz, acting *ultra vires*, and as a rogue president, usurped the authority of the Board to consider the application of RDLF and rejected RDLF unliterally.

81. The Sherry is a New York corporation.

82. New York law requires that a corporation act exclusively by vote of its Board.

83. As the Board never voted on the application of RDLF, Horvitz rejection of RDLF was unlawful.

84. The Trustee refused to return the deposit and acceded to the request of the Sherry that the forfeited $100,000 be paid to the Sherry as maintenance of Unit 1211.

85. The Board and the Trustee then realized that the Board could continue to reject all future bidders indefinitely.

86. The Trustee then accepted the bid of the Board to purchase the apartment for $970,000 that was $305,000 less than the amount that RDLF had contracted to pay.

87. The Sherry acted in bad faith to reject RDLF's bid so it could "steal" Unit 1211 to the detriment of the debtor and her creditors.

### Tenth Count

### All Defendants engaged in pretext as Melching and Sasson did not produce the  litigation record of RDLF until after the Sherry rejected his application

88. Plaintiff repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. supra as if fully set forth herein.

89.   The alleged litigation record of RDLF sourced from Lexis-Nexis was not produced by Defendants until depositions were underway in September 2018 in the case of RDLF v. the Sherry et al.  in the SDNY known as Case No. 17-cv-04759 (PAE).

90.  The litigation record identified Lexis-Nexis as its source but was undated.

91.   Upon information and belief the usual and customary practice of Lexis-Nexis is to date all materials it produces for a client.

92.   Because the litigation record was not produced until after the fact, it therefore could not have been considered in January 2017 when RDLF was rejected.

93. Plaintiff therefore seeks a ruling that the litigation record was a pretext and altered from the documents published by Lexis-Nexis.

### IX Certification and closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule

## X.   Relief requested

Plaintiff respectfully seeks the relief set forth at the end of each of the above Counts  and such other

and further relief, including general relief, as this Court deems just.

New York, New York
January 6, 2019

/s

Rey Olsen, appearing pro se
430 East 86th Street
New York, NY 10028
917 701-1101
wsgny@aol.com